COLLINS et al. v. WILLIAMSON.

(Circuit Court of Appeals, Sixth Circuit. December 17, 1915.)

No. 2648.

1. CORPORATIONS ⬪550—ASSIGNMENTS FOR CREDITORS—VALIDITY—INSOLVENCY.

A deed to all the property of a corporation, duly made in trust for the benefit of creditors, constitutes an assignment, whether the corporation be solvent or insolvent.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2190; Dec. Dig. ⬪550; Assignment for Benefit of Creditors, Cent. Dig. § 94.]

2. CORPORATIONS ⬪550—ASSIGNMENT BY CORPORATION—JURISDICTION OF PROCEEDINGS.

Under the rule that where a judicial tribunal has general jurisdiction of the subject-matter, and the special facts which give it the right to act in a particular case are averred, and not controverted, upon notice to all the parties, jurisdiction is acquired, and cannot be assailed in any collateral proceeding, proceedings on a deed of general assignment made

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

by a corporation under the Ohio statutes are not void because of the fact that the deed is filed and the proceedings are instituted in the insolvency or probate court of a county other, than that in which the principal office of the company is fixed by its articles of incorporation, where the deed recites that the company is of the county in which the deed is filed, and no objection is made by any stockholder or creditor to the jurisdiction of the court, which in such case can only be challenged by direct proceedings.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2190; Dec. Dig. ☞550; Assignments for Benefit of Creditors, Cent. Dig. § 94.]

3. COURTS ☞489—JURISDICTION OF FEDERAL COURTS—SUIT TO SET ASIDE DEED OF ASSIGNMENT.

Gen. Code Ohio, § 1613, vests in the court of insolvency of Hamilton county, and other provisions in the probate courts of other counties, special jurisdiction of proceedings to execute the trust created by an assignment for the benefit of creditors; but such courts are not given general equity power to set aside and vacate such a deed, which is vested in the court of common pleas. *Held*, that a federal court had jurisdiction of a suit for such purpose, where the requisite facts to confer federal jurisdiction were alleged.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1324–1342; Dec. Dig. ☞489.]

4. CORPORATIONS ☞550—VALIDITY—ASSIGNMENTS FOR CREDITORS—PURPOSE OF ASSIGNMENT.

A general assignment by a corporation, forced by its majority stockholders, *held* void, where its purpose was not the protection of creditors, but to coerce stockholders to surrender corporate bonds issued as a bonus with their stock and claimed by the majority to be illegal; such purpose not being within the purview of the assignment statutes.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2190; Dec. Dig. ☞550; Assignments for Benefit of Creditors, Cent. Dig. § 94.]

5. CORPORATIONS ☞553—RECEIVERS—GROUNDS FOR APPOINTMENT.

In a suit to set aside a deed of general assignment by a corporation, the court *held* warranted by the facts in appointing a receiver pendente lite.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201–2216; Dec. Dig. ☞553.]

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

Suit in equity by Frances H. Williamson against Justus Collins, Eugene Zimmerman, George R. Collins, and the Superior Portland Cement Company. Decree for complainant, and defendants bring error. Affirmed.

Justus Collins, Eugene Zimmerman, George R. Collins, and the Superior Portland Cement Company (defendants below) appeal from a decree rendered by the District Court in favor of Frances H. Williamson as plaintiff.

. The defendant company was organized in 1906, with a capital stock of $525,000, divided into 5,250 shares, of $100 each. The articles of incorporation provide that its principal office shall be located at Jackson, Ohio. Its plant is on lands in Lawrence and Scioto counties, purchased of Mrs. Kelley for $100,000, of which sum $10,000 was paid to one Wright as a commission, and by him returned to the company. Mrs. Kelley, as agreed in the terms of sale, subscribed for $50,000 of the stock and paid for the same as calls were made by the board of directors. Wright received stock to the amount of $25,000 for his services in consummating the deal and placing the stock. Following the contract of purchase made with Mrs. Kelley, Stern-

berger, who was solicited to make a large subscription for stock, declined to do so, unless, to protect his stock, bonds to an amount equal to the authorized capital stock should be issued and delivered to the respective stockholders to an extent equal to the stock subscribed for by each. This suggestion was adopted, but with reluctance on the part of Collins. To make it appear that there was a consideration for the bonds, resort was had to a fiction. The records as to the organization of the company, which for convenience had been prepared in advance of the meeting held for that purpose, were interlined so as to show that the purchase price of Mrs. Kelley's lands was $100,000 and $525,000 in bonds, which bonds, bearing 5 per cent. interest, are secured by a mortgage in the usual form made to the Provident Savings Bank & Trust Company as trustee, with which trust company the defendant company subsequently did its banking business. On the delivery of the bonds to Mrs. Kelley she was to return and did return them to the company to be issued by it. Calls were made from time to time for the payment of stock subscriptions, and, when they were paid to the extent of 50 per cent., bonds equaling one-half of the stock subscription of each person were delivered to him by the company. The residue of the bonds were apportioned and delivered when full payment was made for the stock. There was also a later $25,000 issue of preferred stock, one share of common stock being given for every two shares of preferred stock.

Collins, who at all times has been president of the company, became the owner of 2,669 shares of stock, and, with the holdings of his relatives (his wife, son-in-law, and son), continuously owned a controlling interest in the company. The plaintiff and her relatives (including Wright and his wife, formerly Mrs. Kelley) owed 780 shares. Eugene Zimmerman acquired 325 shares. Owing to the financial disturbance of 1907 and depressed business conditions affecting the cement trade, the company did not prosper in the early years of its existence. It has never paid a dividend, or set aside anything to the sinking fund, which was to be five cents on each barrel of cement sold, to care for the bonds. A limited number of the bonds issued passed into the hands of third parties—the plaintiff, for instance, having disposed of hers, and Wright also having parted with at least $12,000 worth of his. Bonds held by the Wrights had been pledged as collateral to an Ironton bank. A small amount of interest was paid on bonds which had gone into the possession of others than members of the corporation; but, excepting such small sums, the company, for want of funds, paid no interest on the bonds or on the unpaid coupons, which it was agreed should bear five per cent. interest. The company's total investment reached about $537,000. Its business required considerable ready cash for its conduct, and to obtain working capital it became necessary at the inception of its business operations to borrow large sums. The trust company limited its credit to $135,000, but, on account of the impairment of the company's credit by the mortgage bond issue, which from the beginning was regarded unfavorably by Collins, required in addition to the defendant company's obligation personal security. Collins indorsed the company's notes and pledged for its benefit all of the stock and bonds issued to him by the company, and also other securities, as collateral. In 1907 the indebtedness before the company's plant was put into operation reached $55,000, and, as the trust company required further personal security when it was desired to increase the loan beyond that amount, Collins, Sternberger, and Zimmerman guaranteed a further loan to the company of $60,000. At one time the sum due to the trust company reached $165,000. The loans were all duly authorized by the board of directors.

The want of funds for the proper transaction of the company's business was well known to the members of the corporation and much considered by them, and, for the purpose of improving its credit, Collins, who was willing to lend his credit to the company, if all its other members did so, became persistently insistent that the stockholders surrender all their bonds, and that he and the others who had become liable for the company's bank indebtedness should be relieved of their liability. The same attitude was assumed by Zimmerman and Sternberger. The return of the bonds to the company was not effected, because the plaintiff and the Wrights did not assent

thereto. Sternberger died in June, 1912, at which time there was due $115,000 to the trust company, which had permitted the renewal of the company's notes from time to time at their maturity. The trust company then requested further security from Sternberger's estate for the $60,000 loan or its payment, and on failure to comply with such request it finally called for the satisfaction of the company's entire indebtedness to it. The trust company had become unwilling to accept the defendant company's notes, even if the entire bond issue were deposited with it, unless personal or other adequate security were also furnished. Without the knowledge of his associates, other than the secretary and treasurer, Collins, on February 26, 1913, at the instance of the trust company, borrowed of it $115,000, giving his note to it for that amount, paid the company's indebtedness to it, took over the $55,000 and the $60,000 notes and the securities pledged for their payment, and deposited the whole of them with the trust company to protect his individual note. He also arranged to pay to the trust company $2,500 for each of the next four months on the debt, and thereafter $5,000 for each succeeding month until the debt was fully paid, which arrangement was reported to the stockholders; but the indebtedness could not be thus liquidated without reducing the funds requisite for the operation of the company's business.

The net profits, which for the year 1912 were about $13,000, in 1913 approximated $70,000; but, owing to the increasing friction within the company, arising out of its financial condition, the effort to get in the bonds, and alleged abruptness on the part of Collins towards certain members of the corporation, and the desire of Collins and Zimmerman to be relieved of their liability to the company, Collins, on his own motion, in each of the months of July, August, and September, paid $10,000 on the bank indebtedness, and on September 16th, in behalf of the company as its president, entered into a contract with the Commercial Credit & Investment Company, of Chicago, by the terms of which he sold to the Credit Company such of the defendant company's contracts and accounts and bills receivable as it then had or might acquire for 80 per cent. of their face value, the remaining 20 per cent. to be paid to the defendant corporation when the accounts were paid in. From the sums collected on the accounts, however, the Credit Company was to retain an agreed compensation. This contract was approved by the company's directory on October 14th. The proceeds arising from the sale made to the Credit Company were so applied by Collins to the bank indebtedness as fully to satisfy it on October 30th. In consequence of such application of its funds, the company was unable to meet its bills payable as it had previously done, but, as they became due, notes were issued for the same. The contract with the Credit Company, the amount of compensation allowed for its services, the use made of the funds received from it, and the nonpayment of current bills intensified the feeling which had theretofore arisen, especially on the part of the plaintiff and her relatives. A meeting of the stockholders and also of the board of directors was therefore duly called for October 31st, to consider the financial condition of the company, and "to take action to protect the financial status of the company, and to take all necessary action tending to that end."

On October 14th, when it was determined to call such meeting, Collins, who was willing, as was Zimmerman, to give financial assistance to the company, if the other stockholders would also do so, believing, as he always had, that the bond issue was invalid, and having decided that he would no longer carry the burden of the company's finances, for the purpose of getting rid of the bonds, determined to cause the company to make an assignment to himself in trust under the state law for the benefit of its creditors; but he did not communicate that fact to the other members of the corporation. He caused the deed of assignment to be prepared, and on October 31st made known his purpose to such members, including Zimmerman, who sanctioned the plan. The making of the assignment was approved at the stockholders' meeting by a vote of 3,371 as against 1,781 shares, and also at the directors' meeting, but the approvals were not without earnest protest from the minority stockholders. The deed was executed, delivered, and filed in the insolvency court in Hamilton county (its power to administer assignments being the same as

that of probate courts), where the offices from which the company's business was directed were located, and also in Lawrence and Scioto counties, in which were the company's lands, but was not filed in the probate court of Jackson county. There was at that time upwards of $13,000 in bank to the company's credit and about $86,000 was owing to merchandise creditors. There was also a judgment against the company for $5,725.

Prior to October 31st Collins had prepared letters to the creditors to be sent out by him as assignee, apprising them of the assignment and that its purpose was to get rid of the bond issue, assuring them of the solvency of the company, and soliciting their consent to a continuance of its business under the authority of the insolvency court. More than three-fourths of them assented, and thereupon, having qualified as assignee by giving a bond of $160,000, he proceeded as assignee under authority of such court to appraise the company's property and to continue its business. The court named appraisers and also recognized as valid the contract with the Credit Company. Following the assignment, negotiations were had to compose the differences between the members of the company. The plaintiff and the Wrights never lent financial assistance to the company, or agreed to surrender their bonds, although in the negotiations immediately preceding the filing of the bill the Wrights suggested that they would either sell their stock at 95 per cent. of its face value and thus eliminate their bond holdings, or that a loan for three years be made for them to take the place of that for which certain of their bonds were hypothecated and thereby enable them to turn in the bonds still in their possession. Before negotiations were concluded, the plaintiff filed her bill in the District Court against the defendants, and on a final hearing that court decreed the deed of assignment to be null and void, enjoined Collins from acting as assignee thereunder, required him to file in such court a complete account of all of his transactions as assignee, assessed against him and Zimmerman the cost, and appointed a receiver for the defendant company, which receiver is still acting. The purpose of this appeal is to reverse such action of the trial court. Collins' conduct, as president, of the company's business operations is not successfully assailed. Annual statements were made by the directors showing the status of the company's affairs.

R. B. Smith, of Cincinnati, Ohio, for plaintiffs in error.

Lawrence Maxwell and Murray Seasongood, both of Cincinnati, Ohio, for defendant in error.

C. W. Baker, of Cincinnati, Ohio, for Standard Oil Co., amicus curiæ.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

SATER, District Judge (after stating the facts as above). [1] It is not necessary to a decision of this case to determine, as counsel would have us do, whether the company was insolvent at the time the deed of assignment was executed and delivered to Collins, for the reason that a deed duly executed and delivered in trust for the benefit of creditors constitutes an assignment, whether the assignor be solvent or insolvent. Wambaugh v. N. Y. Mut. L. Ins. Co., 59 Ohio St. 228, 241, 52 N. E. 859; Rockel's Complete Ohio Prob. Pr. § 1547; In re Farrell, 176 Fed. 505, 512, 100 C. C. A. 63 (C. C. A. 6).

[2] That the deed of assignment was not filed in Jackson county and that the assignment proceedings were not given in charge of the probate court of that county is not, as claimed by plaintiff, of controlling importance. The company's articles of incorporation, in compliance with section 8625, General Code Ohio, state where its principal office is to be located; i. e., at Jackson, Ohio. The company never availed itself of the privilege of so amending its charter as to change such place, as authorized by sections 8719-8723. Section 11092 re-

quires that a deed of assignment made by a corporation shall be filed in the probate court of the county in which the assignor resides. Such assignment becomes effective only from the time of its delivery to the probate judge. Section 11093. In Pelton v. Transportation Co., 37 Ohio St. 450, it was held that a certificate of incorporation which under the statute specifies the place where the principal office of the company is to be located is conclusive as to the location of such office; but sections 11092 and 11093 do not say that, if a corporate deed of assignment be filed elsewhere than at the company's place of residence, such deed or the administration of a corporate estate by a probate court other than that sitting in such county shall be void. On the contrary, in all such cases a remedy is given by section 11094, by the terms of which, on failure for 10 days after the execution of the deed of assignment to file it or a copy of it in the proper county and of the assignee to give bond as required by law, the probate court of such county on application of the assignor or of any of his creditors, shall remove the assignee and appoint another in his place.

The deed of assignment specifically recites that the assignor is "the Superior Portland Cement Company, of the city of Cincinnati, county of Hamilton, state of Ohio, a corporation organized and doing business under the laws of the state of Ohio." The deed was sufficient on its face to warrant the insolvency court to assume jurisdiction, and nothing appeared in it or in any of the proceedings in that court to suggest that jurisdiction was wanting. Neither the assignor nor any of its members or creditors challenged that court's right to proceed with the administration of the defendant company's estate, or invoked action by the Jackson county probate court. The rule is that where a judicial tribunal has general jurisdiction of the subject-matter, as the insolvency court in this case had, and the special facts which give it the right to act in a particular case are averred and not controverted upon notice to all the parties, jurisdiction is acquired and cannot be assailed in any collateral proceeding. Black on Judgments, § 240. When there is a lack of power or want of jurisdiction in the court, all its acts are void; but when there is merely a wrongful or defective execution of power, its acts are voidable only, and must be reversed upon error. Lessee of Cochran's Heirs v. Loring, 17 Ohio, 409, 423; Moore v. Robison, 6 Ohio St. 302, 305. The situation presented is analogous to that in which a suit is filed in a federal judicial district in which none of the parties to the action reside. The defect as to jurisdiction being simply as to the district in which suit is brought, the parties being citizens of different states, the objection is waived, if the parties make up the issues without objecting to the jurisdiction of the court. Kreigh v. Westinghouse & Co., 214 U. S. 249, 252, 253, 29 Sup. Ct. 619, 53 L. Ed. 984.

[3] It is earnestly urged that the District Court was without jurisdiction to entertain the plaintiff's bill. By the terms of section 1613, General Code of Ohio, the court of insolvency, as regards the administration of assignments in trust for the benefit of creditors, has the same jurisdiction, exercises the same powers, and discharges the same duties as are enjoined by the Constitution and laws of the state upon

probate courts, and all laws in force or hereafter enacted regulating the manner of proceeding in the administration of such assignments by the probate court extend to the court of insolvency. If a deed of assignment is valid, the jurisdiction of the insolvency court therefore extends only to qualifying assignees, controlling their conduct, and settling their accounts, and to causing the trust created by the deed to be executed according to law. That court does not have the general equity power to set aside and vacate such a deed, but such power is vested in the court of common pleas. Home & Savings Association v. Jones, 64 Ohio St. 147, 157, 158, 59 N. E. 885. Such power being thus vested and the facts averred in the bill being such as confer jurisdiction on a federal court, the District Court was required to entertain the case.

[4] The controversy as to whether the appointment of a receiver by the District Court was warranted must be determined from the facts of the case. The company became indebted to the trust company to the extent of $55,000 before the operation of its plant began in the fall of 1907. Collins generously lent his credit to it for that amount, and subsequently for all other sums borrowed. Had he not done so, the enterprise would have failed for want of operating capital. Indeed, for aught that appears, it would have been unable to operate at all. It is not to be presumed that any moneyed institution prudently conducted would extend credit to a new enterprise without an established business which was bonded for practically its entire original cost, and especially if it knew as time passed, as the trust company did, that the company was unable to reduce an outstanding bank indebtedness of $115,000 and was paying neither dividends on its stock nor interest on its bonds. Collins was never unwilling to do for himself what he requested of others as regards the surrender of bonds and the lending of financial credit to the company. The burden of carrying its finances rested peculiarly on him, although Zimmerman and Sternberger to a limited extent shared it with him. Considering that the enterprise was new and without an established business, and that, if permitted to go upon the financial rocks, it would, when closed out, in all probability realize but a small portion of the original cost, and could more easily be bought in by him than by any other stockholder, to the almost certain complete elimination of the plaintiff and her relatives, his reasonable request that the bonds be returned to the company, and that he, Zimmerman, and Sternberger should, as far as practicable, be relieved of their personal liability, which had averted financial disaster to all, and that all the stockholders proportionately aid the company, should have met with a prompt and favorable response from the plaintiff, her sister (Mrs. Wright), and the latter's husband, notwithstanding Collins' greater interest, on account of his larger holdings, and what is charged to have been at times his secret, if not arbitrary, action.

Collins was under no obligation to carry so largely a burden in which others should share. The plaintiff and her relatives apparently neither appreciated the service he had rendered them and all other stockholders, nor endeavored to avert the financial collapse which the

withdrawal of the loan of his credit to the company would produce, although his large investment, amounting to about $275,000, placed him in a position better than theirs to protect himself in case the company encountered financial misfortune. In fairness to his associates, he should have apprised them of his purchase of the notes of the company from the trust company, giving his own note in their stead, and his payment of the indebtedness more rapidly than the contract with that company required; but in so doing he was but shifting the burden to the defendant company, where it rightfully belonged. There seemed to be no way in which he could satisfy the indebtedness for which he, Zimmerman, and the Sternberger estate were bound, other than by permitting the merchandise accounts to remain unpaid, so long as some of the stockholders blocked the only method of giving the company an improved financial standing which would enable it to obtain credit. The corporate members, however, should have been informed in advance, and should have had the opportunity of considering before its consummation the sale of the company's contracts and accounts and bills receivable to the Credit Company, the apparently high price he was paying for its services, and the application of the proceeds of such sale to the payment of the company's debts other than merchandise accounts; and yet had he proceeded, as did the complaining surety in Barbour v. National Exchange Bank, 45 Ohio St. 133, 12 N. E. 5, and applied for a receiver of the company, his course, whether successfully pursued or not, would in all probability have been even more harmful, though acting within strictly legal rights, than was his sale of the quick assets to the Credit Company and the application of the proceeds realized from them to the satisfaction of the company's indebtedness in advance of its actual maturity.

When he determined to cause the company to make a deed of assignment, fair play required that he should incorporate in the notice of the stockholders' and directors' meetings to be held October 31st, that the matter of the assignment was to be considered at that time. He should not have proceeded secretly, and withheld such notice until the day on which the meetings were held. That the outstanding bonds were a menace to the life of the corporation, that they were issued as an inducement to procure stock subscriptions and as a bonus without the payment of any consideration for them, is too manifest to admit of controversy; but what the rights of the holders of them as between themselves, and as between themselves and the company, may be, and as to what method is to be pursued to determine such rights, and the cancellation and the return of them to the company, if it shall ultimately be decided that such shall be done, are matters which we are not now called upon to decide.

We are not, however, informed as to how Collins expected to free the company from the incubus of the bond issue by causing the company to assign all of its property for the benefit of its creditors, and yet that was his purpose in causing the assignment to be made. An assignment will be voided which is made in furtherance of a scheme to obtain an advantageous settlement, to force a compromise or to compel creditors to enter into a composition (4 Cyc. 197, 198), and,

it may be added, whose purpose is not the protection of the creditors, but the coercion of stockholders to surrender corporate bonds, and for the reason that such action is not within the purview of the statute relating to assignments. The assignment, which was secretly planned, was arbitrarily carried out, and constituted an act of bankruptcy which would almost necessarily and speedily terminate the company's business career, to the injury of the stockholders and without benefit to the creditors. A bankruptcy proceeding in fact was, it is stated, instituted and has been held in abeyance only by the planting of the present suit. For the reasons above stated the trial court was justified in voiding the deed of assignment, and in view of Powers v. Blue Grass Building & Loan Association (C. C.) 86 Fed. 705, 707, the appointment of a receiver pendente lite was warranted.

[5] We are not satisfied that a further continuance of the receivership is necessary. With the deed of assignment set aside and the proceedings thereunder enjoined, there seems no occasion, so far as appears from the record before us, for winding up the corporation or withholding from the directors the control of its assets, for it cannot be presumed that the directors will mismanage the corporate business or act otherwise than in conformity to law. Should the retirement of the company's bonds be still desired, no obstacle intervenes to prevent an appropriate action to accomplish that result. The differences between the stockholders are not such as reasonable persons may not adjust. The rule is too well settled to require citation of authority that courts of equity, in the appointment of receivers, act with great caution in applying that extraordinary remedy, and require a clear case of right and of present necessity to induce their interference. The extreme remedy of taking and keeping property of a corporation out of the hands of the managers chosen by the stockholders, except as the last resort, should not be applied unless considered absolutely necessary for the preservation of the corporate property. That necessity, apparently, now ceases with the final decision concerning the validity of the trust deed; but two years have elapsed since this record was made up, and it is possible that something may be presented to the court below justifying a temporary continuation of the receivership. However, we cannot now do as appellants ask and make a peremptory direction that it be terminated.

The decree of the District Court is accordingly affirmed, with costs, but expressly without prejudice to an application to such Court at any time by either party for the termination of the receivership.